710 So.2d 274 (1998)
STATE of Louisiana
v.
Allen Dwayne BURMASTER, Defendant-Appellant.
No. 97-517.
Court of Appeal of Louisiana, Third Circuit.
February 25, 1998.
*275 Michael Harson, Lafayette, Kim R. Hayes, Asst. Dist. Atty, for State.
G. Paul Marx, Lafayette, for Allen Dwayne Burmaster.
Allen Burmaster, pro se.
Before YELVERTON, COOKS and GREMILLION, JJ.
*276 GREMILLION, Judge.
Originally, this case arose on appeal as Docket Number 96-969 wherein defense counsel asserted that no nonfrivolous issues could be raised and that he should be allowed to withdraw pursuant to Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), as interpreted by State v. Benjamin, 573 So.2d 528 (La.App. 4 Cir.1990). In our initial review, we found the record was incomplete because it did not contain the motion to suppress nor the transcript of the suppression hearing. After a thorough review of the record available to us, we denied counsel's motion to withdraw, remanded the matter to the trial court for supplementation of the record, and ordered further briefing. Now, after a careful review of the entire record before us, we affirm the jury verdict.

PROCEDURAL HISTORY
The defendant, Allen Dwayne Burmaster, allegedly committed the murder of James Verdin on May 7, 1990. As a result of this crime, he was indicted by a grand jury for second degree murder. Defendant originally pled not guilty and not guilty by reason of insanity, but eventually accepted a plea bargain, agreeing to plead guilty to manslaughter and other unrelated felonies in return for sentencing as a habitual offender totaling forty-two years. In 1994, Defendant challenged his convictions and sentences on the ground that the trial court should have determined his mental competency to proceed before accepting his guilty pleas. See State v. Burmaster, an unpublished writ bearing docket number 94-359 (La.App. 3 Cir. 10/27/94). As a result of this challenge, the entire plea bargain was revoked and Defendant again faced a second degree murder charge.
After a competency hearing, the trial court found Defendant to be mentally competent to proceed to trial. Defendant was again arraigned on June 6, 1995, and pled not guilty. Defendant was subsequently tried, found guilty by a jury, and sentenced to life imprisonment, without benefit of probation, parole, or suspension of sentence.
Defense counsel filed the aforementioned Anders brief and we remanded with instructions to supplement the record and ordered further briefing of three issues: 1) the admission of the hearsay testimony of what Sadie Verdin said to Eves Fontenot and Deputy Albert Lewis; 2) the dilatory disclosure of inculpatory letters Defendant wrote to Jackie Savoy; and 3) the denial of the motion to suppress. Defendant was also allowed to file supplemental assignments of error and brief in his own right. He alleges three additional assignments of error: 1) that his due process was violated when the trial court required him to prove his incompetency to stand trial by a higher standard of proof than required by the Fourteenth Amendment of the Constitution of the United States; 2) that the trial court failed to adhere to criteria set forth in State v. Bennett, 345 So.2d 1129 (La.1977), in finding him competent to stand trial; and 3) that his counsel was ineffective in failing to object to the trial court's ruling finding him competent.

FACTS
Defendant shot the victim to death at the home of the victim's grandmother, Sadie Verdin. Present at the time of the shooting were Defendant, Jackie Savoy, the victim, and Verdin. Savoy, Defendant's girlfriend, was eight-months pregnant with his child and apparently having an intimate relationship with the victim. By the time of trial, Sadie Verdin had died. Thus, the only surviving witnesses to the shooting were Defendant and Savoy.
The evidence reflects that Defendant lived with Savoy on and off for at least one year prior to the shooting. Their relationship was rocky at best with the couple separating on several occasions. While Defendant was out of town working, Savoy had relationships with other men, the last being with the victim. The evidence shows that at the time of the shooting, Defendant and Savoy were living together in the home of Savoy's mother and sister, Mary Janell Semar and Vickie Savoy respectively. It was while they were living there that Savoy began seeing the victim. This caused friction between Defendant and the victim, and the two had previously engaged in an argument so violent that the police had to be called.
*277 According to the evidence, on May 6, 1990, the day before the shooting, Defendant left for work at his new job on an oil rig. Before leaving, he asked Savoy not to see the victim. However, she ignored his request and met the victim in a bar a short time after Defendant left for work. Both Savoy and the victim left the bar together.
When Defendant returned to Semar's home on the morning of May 7, 1990, not only did he not find Savoy there, but Semar refused to allow him inside. The testimony reflects that Semar said she did not know where Savoy was when Defendant asked her whereabouts. Defendant, along with Joseph Hoffpauir, began looking for Savoy. They first went to the Verdin home. Hoffpauir went to the door and knocked, but no one answered. Defendant continued his search eventually returning to the Verdin home. The victim answered the door and told Defendant that Savoy was not there. According to Savoy, she was actually there but she did not want to see Defendant.
Defendant then went back to the Semar home to get his clothes and a bottle of rum he kept in a cabinet. This time Vickie let him in. Next to the rum was Semar's .22 caliber handgun. Vickie did not see Defendant take the gun, but when she heard about the shooting she looked inside the cabinet and saw that both the gun and the bottle of rum were gone.
The evidence further shows that after leaving the Semar home, Defendant went back to the Verdin home a third time. Again the victim answered the door and this time Savoy came out of the back bedroom and spoke to Defendant. According to Defendant, he wanted to talk to Savoy about her leaving him again, but the victim told her to go back inside. Defendant contended that she wanted to stay and talk to him. On the other hand, Savoy testified that Defendant wanted to talk to her, but she was afraid and did not want the victim to leave her alone with him. Savoy testified that when she saw Defendant lift his right hand up to his waist, she ran into a bedroom where she heard shots.
Eves Fontenot testified that at approximately 2:00 or 2:30 p.m. on the date of the shooting, he was working in his tool shed when he heard gunshots coming from the home of his neighbor, Verdin. Fontenot said he looked out of the window and saw a man hurriedly leave the Verdin home, get in a car, and drive away. He testified that Verdin began to scream for him, so he went over and found the victim lying on his back. When he asked Verdin what happened, she told him, "he shot my boy" or "he killed my boy." At that time, according to Fontenot, Savoy came into the living room, and when he asked if anyone had called the law, Savoy stated that she had.
The first officer to arrive at the scene was Deputy Albert Lewis of the Acadia Parish Sheriff's Office. Deputy Lewis testified at trial that Savoy and one of the victim's children met him in the driveway and Savoy said, "That m_____-f_____ killed him. Dwayne, that m_____-f_____ killed him." Deputy Lewis found Verdin inside, seated next to the body of the victim holding another of the victim's children. Deputy Lewis said Verdin was crying at the time and mumbling, "I wish it were me" and "why he took my baby, why he did that to my baby." When Deputy Lewis asked Verdin what happened, she told him "Jackie's boyfriend killed my baby."
Morgan Hale, a bartender at a local bar, testified that the night before the shooting, he overheard Defendant talking with Savoy about the victim. He said Defendant told Savoy that if she left with the victim, he was going to kill both of them. According to Hale, Savoy assured Defendant she would not leave with the victim, but five minutes after Defendant left the bar, the victim came in and Savoy left with him. Further, Hale testified that on the morning of the shooting, Defendant came by the bar looking for Savoy. After Hale told him he did not know where she was, Defendant stayed at the bar and drank until 12:15 p.m.
Kent Sittig, a friend and co-worker of Defendant, testified that Defendant brought the car borrowed from another co-worker to his house sometime between 2:30 and 3:00 p.m., on May 7, 1990. At that time, Defendant said, "I did it. I finally did it." He then *278 explained that "I shot him ... I shot him three times, bam, bam, bam."
Defendant was arrested later that afternoon at Ritter's Bar in Iota by officers of the Acadia Parish Sheriff's Office. He was informed of his Miranda rights by Detective Ralph Lacombe and transported to the sheriff's office in Crowley by Lieutenant Walter Harrington, Detective Jerry Stutes, and Deputy Dean Venable of the Acadia Parish Sheriff's Office. The officers testified that no one asked any questions of Defendant during the trip to the sheriff's office. However, the officers testified that, along the way, Defendant asked if the victim was still alive. According to the officers, when no one responded, he volunteered, "Well, I shot the m_____-f_____three times; pow, pow, pow;" "he would never get another hard-on;" and "[he would] ... never f_____a pregnant woman again."
Detective Johnny Meyers was called to perform an atomic absorption test on Defendant's hands. Detective Meyers said that Defendant told him that he did not have to do the absorption test on his left hand because he shot the victim with his right hand, saying, "[d]o it all on the right hand; that's what I shot him with." Moreover, Defendant gave a taped confession to Detective Charles Lafosse wherein he admitted that he shot the victim.
At trial, Defendant said the reason he confessed to committing the crime was to prevent Savoy from going to jail. Defendant testified that she was holding her purse when she entered the porch; and, when the victim told her to go back inside, she pulled out the gun, shot the victim, threw down the gun, and ran to the back of the house. Defendant said he then picked up the gun and left. He testified that while driving he realized he had the gun with his fingerprints on it, so he threw it out of the car window and decided to take the rap for the shooting rather than have Savoy go to prison.
We shall address Defendant's pro se assignments of error before moving to the assignments of error we ordered briefed.

THE BURDEN OF PROOF
By this assignment of error, Defendant contends he was found competent to stand trial because he was required to prove his incompetence by the onerous standard of clear and convincing evidence. Defendant asserts that this standard is improper in that he need only prove his incompetence by a preponderance of the evidence. In Cooper v. Oklahoma, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), the United States Supreme Court held that the presumption that a defendant is competent is permissible because this burden does not offend any principles of justice so rooted in our traditions as to be ranked fundamental. However, the Court found that principles of justice which are rooted in tradition and the conscience of our people, as well as fundamental fairness together with the dangers of an erroneous determination of competency, requires a less onerous burden than proof by clear and convincing evidence. The Court reasoned that this result followed the well-settled determination that the criminal trial of an incompetent defendant violates due process and that, although states may generally govern the procedures by which their laws are given effect, a due process violation may occur if the procedures do not sufficiently protect an incompetent criminal defendant's fundamental constitutional right not to stand trial. Id. Further, Cooper holds that a defendant's fundamental right to be tried while competent, i.e., when he has a present ability to understand the charges against him and can communicate effectively with his defense counsel, "outweighs the State's interest in the efficient operation of its criminal justice system." Id. at 349, 116 S.Ct. at 1383.
In State v. Frank, 96-1136 (La.10/4/96); 679 So.2d 1365, 1366, our supreme court found that Cooper made it clear that:
La.C.Cr.P. art. 648(A), as amended by 1990 La.Acts No. 755, violates the Due Process Clause to the extent that it requires the defendant in a criminal prosecution to prove his incompetency to stand trial by clear and convincing evidence. Cooper has returned Louisiana to this Court's jurisprudential rule that a criminal defendant need prove his incapacity to proceed *279 only by a clear preponderance of the evidence. State v. Brooks, 541 So.2d 801, 805 (La.1989); State v. Machon, 410 So.2d 1065, 1067 (La.1982).
The court in Frank chose to use the phrase "a clear preponderance of the evidence." Id. (emphasis added). Cooper does not utilize such a qualifying adjective; however, we note State v. Riviere, 225 La. 114, 72 So.2d 316 (1954), which held that proof by a preponderance of the evidence was the appropriate standard, while State v. Bailey, 233 La. 40, 96 So.2d 34 (1957), cites Riviere for the principle that a clear preponderance is necessary. Bailey does not expand Riviere, but merely cites the case and introduces the additional qualifier, "clear." From Bailey to Frank, the jurisprudence retains the word "clear;" however, we believe the word is superfluous. The word "preponderance" denotes a superiority of weight or outweighing; it is irrelevant to what degree. Any other qualifier to the "preponderance of the evidence" standard of proof would create yet another standard of proof greater than the preponderance of the evidence standard and approaching the clear and convincing standard. Cooper does not allow Louisiana courts to require a criminal defendant to prove his incompetency by a standard of proof greater than by the preponderance of the evidence standard.
Initially, we note that the trial court in the instant case did not allude to the standard of proof it required of Defendant in his attempt to prove his incompetency. Accordingly, it is necessary to determine whether the trial court erred in requiring proof of incompetency beyond the preponderance of the evidence standard. The evidence introduced at the sanity commission hearing consisted of the testimony of Dr. Joe B. Holden and Dr. Robert L. McManus, and their reports of their consultations with Defendant. Although the two physicians were not psychiatrists, the record reflects that they each possessed the qualifications to conduct competency evaluations. See La.Code Crim.P. art. 644. Both doctors evaluated Defendant and found him to be competent to stand trial. There was no evidence to the contrary. Thus, Defendant failed to prove his incompetency by a preponderance of the evidence.

THE BENNETT CRITERIA
Defendant also contends that the sanity commission failed to adhere to the criteria set forth in State v. Bennett, 345 So.2d 1129 (La.1977). In Bennett, the court articulated the appropriate considerations that should be utilized in determining whether a criminal defendant is fully aware of the nature of the proceedings against him. They are:
[W]hether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction.
Id. at 1138.
Further, Bennett set forth the facts which should be considered in determining a criminal defendant's ability to assist in his defense. They include:
[W]hether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial.
Id.
The testimony of the doctors, and particularly their reports, clearly show that each extensively considered the criteria set forth in Bennett in finding Defendant competent. At the sanity hearing, Defendant chose to focus on the qualifications of the physicians instead of challenging their findings. We are *280 cognizant that Defendant is an indigent and forced to rely on the findings of the sanity commission. Further, we note that he has a right to demand a thorough examination. The record reflects the members of the sanity commission thoroughly evaluated Defendant utilizing the Bennett criteria, and we hold the trial court did not err in relying on their evaluations in finding him competent to stand trial. Therefore, this assignment of error is without merit.

EFFECTIVE ASSISTANCE OF COUNSEL
Defendant contends in this assignment of error that he was denied effective assistance of counsel based on his counsel's performance at the April 5, 1995 sanity hearing. Defendant seemingly claims his attorney did not object to the competency hearing, the procedure by which it was conducted, and the findings of the trial court. Normally, ineffectiveness of counsel claims are more properly raised in an application for post-conviction relief rather than by direct appeal unless the record fully discloses the evidence necessary to decide the issue. State v. Green, 562 So.2d 35 (La.App. 3 Cir. 1990). Based on our findings above and a complete review of the record before us, we cannot find that counsel's performance was so deficient that it deprived Defendant of his rights as guaranteed by the Sixth Amendment. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Accordingly, we find that this assignment of error is also without merit.

ADMISSIBILITY OF STATEMENTS AND CONFESSION
In this assignment of error, Defendant alleges that his confession and other inculpatory statements made by him were illegally obtained and that the trial court erred in refusing to suppress them. Defendant's first statements were given to the deputies in their vehicle while they were en route to the sheriff's office. Defendant was advised of his Miranda rights upon his arrest and before he was placed in the deputy's vehicle for transportation to the sheriff's office. Defendant voluntarily and spontaneously told the officers that he shot the victim. Although Defendant was in custody and under arrest, the officers did not initiate or encourage any conversation between themselves and Defendant. Therefore, since the statements were unsolicited and voluntary, and not the product of a custodial interrogation by the deputies, they were admissible. State v. Ross, 95-1798 (La.3/8/96); 669 So.2d 384; State v. Fisher, 626 So.2d 548 (La.App. 3 Cir.1993), writ denied, 93-2990 (La.4/7/94); 635 So.2d 1131.
Defendant made another admission when he told the technician performing the atomic absorption test that he need not swab Defendant's left hand since he fired the gun with his right. Again, the spontaneous admission was free and voluntary, following no inducement whatsoever from law enforcement. Defendant made additional inculpatory statements after repeated warnings to cease and wait for counsel. All of these statements were voluntary, spontaneous, and unsolicited, and, therefore, admissible. Ross, 669 So.2d 384; Fisher, 626 So.2d 548.
Finally, Defendant formally confessed to the murder in a taped statement to police officers subsequent to being advised once again of his Miranda rights and after executing a written waiver. The record clearly shows that Defendant's confession was given freely, voluntarily, and intelligently, and was not made under fear, duress, menaces, threats, inducements, or promises. State v. Smith, 95-1171 (La.App. 3 Cir. 4/24/96); 677 So.2d 458.
Additionally, Defendant asserts that his intoxication rendered all of his statements inadmissible; however, the law clearly provides that Defendant must have been "unconscious of the consequences" of his statements in order that a confession be rendered inadmissible because of intoxication. State v. Brooks, 505 So.2d 245 (La.App. 3 Cir.1987). In Brooks, this court stated:
Before a confession can be introduced into evidence, the state has the burden of proving that the confession was free and voluntary. La.R.S. 15:451. Where the free and voluntary nature of a confession is challenged on the ground that the accused was intoxicated at the time of interrogation, *281 the confession will be rendered inadmissible only when the intoxication is of such a degree as to negate defendant's comprehension and to render him unconscious of the consequences of what he is saying. Whether intoxication exists and is of a degree sufficient to vitiate the voluntariness of the confession is in the first instance a question for the trial judge. His conclusions on the credibility and weight of the testimony relating to the voluntariness of a confession will not be overturned unless they are not supported by the evidence. State v. Robinson, 384 So.2d 332, 335 (La.1980).
Id. at 247
A review of the record produces no evidence which shows that Defendant was so intoxicated that he did not comprehend what he was saying. In fact, Defendant could not produce even one witness to corroborate his intoxication defense. We, therefore, find that the trial court properly concluded that Defendant's intoxication did not vitiate the voluntariness of his statements or confession. See State v. Smith, 407 So.2d 652 (La.1981). This assignment of error is without merit.

HEARSAY TESTIMONY
We address in this assignment of error whether improper hearsay testimony was allowed at trial. The first statements were by Deputy Lewis, who testified as to what Savoy and Verdin said upon his arrival at the scene. Deputy Lewis, the first officer on the scene, said when he arrived he saw Savoy standing in the driveway. According to Deputy Lewis, Savoy was crying and when he got out of the car she screamed and hollered, "That m_____-f_____ killed him. Dwayne, that m_____-f_____, killed him."
Deputy Lewis testified that Verdin, the victim's grandmother, was inside sitting on a wooden bench next to the dead victim, holding a small child and crying and mumbling. According to Deputy Lewis, she mumbled something like, "I wish it were me;" "Why he took my baby;" and "Jackie's boyfriend killed my baby." Unfortunately, Verdin died between the date of the shooting in 1990 and trial in 1996. It is unclear whether she witnessed the shooting since she was in the living room when Defendant, the victim, and Savoy met outside in the porch area where the fatal shot was fired. However, the mortally wounded victim ran to her immediately after he was shot and died at her feet.
Finally, there was the testimony of Fontenot, who immediately responded to Verdin's call for help. He testified that when he walked into the home, approximately two to three minutes after Verdin called for him, she hollered, "He killed my boy" at him.
The Savoy statement was admitted as an excited utterance, the Verdin statement as an excited utterance and res gestae, and the Fontenot statement was not objected to. In order to preserve an assignment of error, a party must timely object to the admission of the evidence. La.Code Evid. art. 103(A)(1). Since no contemporaneous objection was made to the admission of the Fontenot statement, we shall not consider it further. In regard to the excited utterance exception of the hearsay rule, we look to the recent decision in State v. Beason, 26,725, p. 15 (La.App. 2 Cir. 4/7/95); 653 So.2d 1274, writ denied, 95-1388 (La.10/27/95); 661 So.2d 1359, where the court held:
An excited utterance is not excluded by the hearsay rule. It is defined as "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." LSA-C.E. Art. 803(2). This exception requires an event sufficiently startling to render a declarant's normal reflective thought process inoperative. Further, the statement of the declarant must have been a spontaneous reaction to the event and not the result of reflective thought. State v. Reaves, 569 So.2d 650 (La.App. 2d Cir.1990), writ denied, 576 So.2d 25 (La.1991).
In determining whether a statement was made under the stress of the startling event, the most important factor is time. Other factors include whether the statement is self-serving or in response to an inquiry, whether the statement is expanded beyond a description of events to include past or future facts, and whether the *282 declarant performed tasks requiring reflective thought between the event and the statement. Reaves, supra.

Id. at 1284 (emphasis added).
Certainly, one would consider either witnessing a murder or being in such close proximity to the commission of a murder that the declarant could hear the gunshots and witness the death of the victim to be an event startling enough to render the declarant's reflective thought process inoperative. The statements by both Savoy and Verdin were made within a short time after the shooting. Deputy Lewis testified that he got to the Verdin home six minutes after he received the call on his radio and both statements were made to him within five minutes of his arrival. The statements were not self-serving, nor did they expand the description of events to include any other facts. While Savoy may have taken time to call the police, her condition as described by Deputy Lewis when he arrived would indicate that she was under the stress of excitement caused by the murder. The very nature of her statements reflect that they were spontaneous.
Verdin was clearly under such stress. She was holding the victim's child, and was mumbling and crying. She had not performed any tasks requiring reflective thought and simply repeated what she told Fontenot only minutes before. As with the Savoy statement, Verdin's statement does not expand the description of events and its very nature indicates it was spontaneous. Therefore, we cannot find the trial court committed error in admitting the statements under the excited utterance exception to the hearsay rule. In addition to excited utterances, the State also relied on the res gestae doctrine rule in admitting the statement of Verdin. La.Code Evid. art. 801(D)(4) provides:
D. Statements which are not hearsay. A statement is not hearsay if:
....
(4) Things said or done. The statements are events speaking for themselves under the immediate pressure of the occurrence, through the instructive, impulsive and spontaneous words and acts of the participants, and not the words of the participants when narrating the events, and which are necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous transaction.
The "things said and done" (res gestae) provision seems to be more expansive in nature than the excited utterance exception, allowing testimony that is perhaps more attenuated insofar as temporal proximity is concerned. Indeed, relying on State v. Kimble, 407 So.2d 693 (La.1981), we have held that "[t]he doctrine of res gestae includes not only spontaneous utterances and declarations made before and after the commission of the crime, but also testimony of witnesses and police officers pertaining to what they heard or observed before, during, or after the commission of the crime if the continuous chain of events is evident under the circumstances." State v. Crawford, 95-1352, pp. 5-6 (La.App. 3 Cir. 4/3/96); 672 So.2d 197, 201-202, writ denied, 96-1126 (La.10/4/96); 679 So.2d 1379. However, we are cognizant of the holding in Buckbee v. United Gas Pipe Line Co. Inc., 561 So.2d 76, 83-84 (La.1990) (footnote omitted):
In Louisiana, res gestae was formerly defined and rendered admissible by statute. La.R.S. 15:447-448 (repealed by Acts 1988, No. 515 (effective Jan. 1, 1989)). Although Louisiana's statutory definition of res gestae was narrowly drawn, the exception often received expansive treatment in the courts. See, e.g., State v. Washington, 444 So.2d 320, 324 (La.App. 1st Cir.1983). Nevertheless, the res gestae exception was more properly limited to "spontaneous words or acts of the participants at the time of the occurrence" rather than a participant's narration of events. State v. Williams, 331 So.2d 467, 470 (La.1976). As the Williams Court explained, "(t)he res gestae exception permits admission of events speaking through participants, but not the testimony of participants speaking about events." Williams, 331 So.2d at 470.
We recognize the distinction between Kimble and Buckbee and we note that Kimble was written prior to the codification of the Code of Evidence and Buckbee after, and that Buckbee appears to narrow the res gestae rule. We also recognize that Buckbee is *283 a civil case, but certainly its narrow approach to construing the res gestae rule would apply to criminal cases. In that light, we find that the Verdin statement is admissible also as res gestae. Verdin's statements were not narrations of the event, but were events speaking through a participant. She may not have seen the fatal shots but she surely heard them. Her grandson ran to her immediately after the shooting and died in her presence. She played a part in the event. Her words were impulsive and spontaneous, occurring under the immediate pressure of the event. Further, the statement was part of the continuing event: the murder, the call for help, and the response to that call. It necessarily formed part of one continuous transaction.
Likewise, using the same analysis, we find Savoy's statements were part of the res gestae. They were said under the immediate pressure of the occurrence, they were instructive, impulsive, and spontaneous, and they formed, in conjunction with the event, one continuous transaction.
Lastly, Defendant objected to Hale's statement concerning what he overheard Defendant tell Savoy the night before the shooting. Hale, the bartender, testified that he overheard Defendant tell Savoy that if she left with the victim, he would kill both of them. A statement is not hearsay if it is offered against a party and is his own statement. La.Code Evid. art. 801(D)(2)(a). Accordingly, it has been held that threats made by a defendant before commission of the murder are not hearsay, but are admissions. State v. Marr, 626 So.2d 40 (La.App. 1 Cir. 1993), writ denied, 93-2806 (La.1/7/94); 631 So.2d 455, and State v. Dixon, 620 So.2d 904 (La.App. 1 Cir.1993). Therefore, Hale's testimony was properly admitted as an admission by Defendant.

INCULPATORY STATEMENTS
The next assignment of error addressed by Defendant was the State's failure to timely deliver to him certain letters he wrote to Savoy while he was incarcerated after his arrest. After jury selection, the State, "out of an abundance of caution," gave Defendant copies of the letters. These letters contained inculpatory statements such as "I know you're going to testify against me in court, and I understand that, because you were a witness," and "I wish you could forgive me for what I have done. I'm very sorry." According to the State, the letters, which it received three days before the trial began, were to be used to impeach Defendant if he testified. Defendant claimed lack of notice and moved for a mistrial explaining that had he known of these letters, he would have changed the theory of his case during voir dire. Defendant argued that in voir dire he allowed the prospective jurors to know he had prior convictions in anticipation of taking the stand in his own behalf. He claims, in his motion for mistrial, that had he known of the letters, he may not have discussed his prior convictions, but instead may have discussed his Fifth Amendment right to remain silent and not testify. Defendant eventually did take the stand and was confronted with the letters.
In State v. Mitchell, 412 So.2d 1042 (La. 1982), the Louisiana Supreme Court was confronted with a situation similar to the instant case when the State did not reveal it had an inculpatory letter sent by the defendant to the victim's family until after defendant had taken the stand. The court stated:
The discovery rules in the Louisiana Code of Criminal Procedure are intended to eliminate unwarranted prejudice which could arise from surprise testimony. State v. Toomer, 395 So.2d 1320, 1329 (La.1981).
This Court has previously held that where the defendant is lulled into a misapprehension of the strength of the State's case and suffers prejudice when the (oral) statements are subsequently introduced at trial, basic unfairness which constitutes reversible error results. State v. Boothe, 310 So.2d 826 (La.1975); State v. Jenkins, 340 So.2d 157 (La.1976); State v. Sharp, 338 So.2d 654 (La.1976); State v. Hatter, 350 So.2d 149 (La.1977).
In the present case, the prosecutor received the evidence on the morning of the second day of trial. Before notifying the defendant of the evidence, the prosecutor reopened his case and questioned the victim's *284 mother. The State then rested and the defendant took the stand. It was not until cross-examination of the defendant had begun that the State provided defense counsel with notice of the letter and its contents.
Although the State's failure to comply with discovery procedures will not automatically demand a reversal, if the defendant is prejudiced by the failure to disclose he is entitled to a reversal. State v. Davis, 399 So.2d 1168 (La.1981).
Id. at 1044
Defendant filed a Motion for Discovery and Inspection which was answered by the State, which moved "to introduce all statements to clear the record for trial." Upon motion of the defendant, the court shall order the state to provide the defendant with any written statements of any nature made by the defendant which is in possession, custody, control, or knowledge of the state. La. Code Crim.P. art. 716. The state has a continuing duty to promptly disclose additional statements to defendant once such statements come to its attention. La.Code Crim.P. art. 729.3. In the case sub judice, the State failed to promptly notify or disclose the letters to Defendant. Therefore, we find that the trial court erred in allowing the State to use the letters to impeach Defendant. However, our next inquiry requires us to determine whether the harm caused by the trial court's ruling resulted in a reversible error or harmless error. We note that the Mitchell court held that the State's failure to comply with discovery will not automatically result in a reversal. Faced with a similar situation, our colleague's in the first circuit found:
The suppression of evidence favorable to an accused by the prosecution violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). See also Kyles v. Whitley, 514 U.S. 419, 432-33, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490 (1995). Evidence favorable to an accused includes exculpatory evidence as well as evidence which can be used to impeach prosecution witnesses. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). Favorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682 and 685, 105 S.Ct. at 3383 and 3385. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383.
In reviewing materiality, this court must provide a cumulative evaluation of the suppressed evidence, keeping in mind the defendant does not have to show that, with the addition of the undisclosed evidence, his trial would have resulted in acquittal, or that there would be an insufficiency of the evidence to support a conviction. The defendant need only show that "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." State v. Marshall, 94-0461 and 81-3115 (La.9/5/95), 660 So.2d 819, 826 (quoting Kyles v. Whitley, 514 U.S. at 440-42, 115 S.Ct. at 1569). Once a reviewing court applying Bagley has found constitutional error, the error cannot subsequently be found harmless. Kyles v. Whitley, 514 U.S. at 433-35, 115 S.Ct. at 1566.
In the instant case, the issue is the timeliness of the state's disclosure rather than the failure to disclose. Disclosure of favorable evidence by the state must be made at such a time as to allow the defense to use the material effectively in the presentation of its case. State v. Prudholm, 446 So.2d 729, 738 (La.1984). Not all cases involving late disclosure of favorable evidence result in reversible error. We must determine if the late disclosure so prejudiced the defendant that he was denied his constitutional right to a fair trial. See State v. Smith, 430 So.2d 31, 42 (La.1983). See also United States v. Stephens, 964 F.2d 424, 435-36 (5th Cir.1992). *285 State v. Huls, 95-0541, pp. 11-12 (La.App. 1 Cir. 5/29/96); 676 So.2d 160, 169-170, writ denied, 96-1734 (La.1/6/97); 685 So.2d 126.
We cannot find that the late disclosure so prejudiced Defendant that he was denied his constitutional right to a fair trial or that timely disclosure of the letters would have made a different result reasonably probable. The evidence in the instant case, unlike in Mitchell, where the only witness against the defendant was a six-year-old child, was substantial. When the totality of the evidence is viewed as a whole, the tardy disclosure of the letters played a minuscule part of the entire proceedings. With the massive evidence against Defendant, the late disclosure of the letters did not deprive him of a fair trial.
Based on our findings above, this assignment of error is, likewise, without merit.

CONCLUSION
For the reasons set forth above, we find that the trial court did not abuse its discretion in finding Defendant competent to stand trial; in refusing to suppress Defendant's confession and other statements voluntarily given; and in allowing the admission of the witnesses' hearsay statements. We also find that even though the trial court committed error in allowing the State to use Defendant's letters to impeach him, the error was harmless. We, therefore, affirm Defendant's conviction and sentence.
AFFIRMED.