NOT FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

09-19

STATE OF LOUISIANA

VERSUS

WILBERT JOSEPH JOHN

**********
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 107,139
HONORABLE KRISTIAN DENNIS EARLES, PRESIDING
**********

SYLVIA R. COOKS
JUDGE

**********

Court composed of Sylvia R. Cooks, James T. Genovese and Shannon J. Gremillion, Judges.

CONVICTIONS AFFIRMED;  SENTENCE FOR FORCIBLE RAPE AFFIRMED; SENTENCE FOR SIMPLE KIDNAPPING VACATED; REMANDED FOR RESENTENCING.

Michael Harson, District Attorney
Cynthia K. Simon, Assistant District Attorney
P.O. Box 3306
Lafayette, LA 70502
(337) 232-5170
COUNSEL FOR APPELLEE:
    State of Louisiana

W. Jarred Franklin
Louisiana Appellate Project
3001 Old Minden Road
Bossier City, LA 71112
(318) 746-7467
COUNSEL FOR DEFENDANT-APPELLANT:
    Wilbert Joseph John

**COOKS, Judge.**

Defendant, Wilbert Joseph John, appeals his convictions and sentences on the charges of forcible rape and simple kidnapping. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

On April 7, 2005, the victim, a twenty-year-old college student at Tulane University, was in Lafayette, Louisiana to participate in an engineering competition at a civil engineering conference held at the University of Louisiana, Lafayette. She had never been to Lafayette before and did not know, nor had she ever seen Defendant.

The victim, along with several friends, drove to the Keg, a popular college bar. Around 9:00 p.m., the victim and her friends decided they should return to their hotel because they had to get up early in the morning to prepare for the competition. Before leaving, the victim went to the restroom, but when she returned, she did not see her friends. She walked outside to look for her friend's car. Defendant approached the victim in the parking lot, walked up behind her, grabbed her by her wrists and began making small talk. The victim pleaded with Defendant to let her go so she could find her friends, but instead, Defendant insisted on "showing her a good time."

When Defendant began to pull the victim away from the area, she squatted down, making herself dead weight. He continued to drag her across the ground, telling her to get up and come on or else he would beat her. When she did not comply, Defendant punched her in the face and threatened to hurt her if she did not go with him. The victim then tried to placate Defendant. She got up and he started to lead her away from the parking lot. The two continued to walk for about twenty minutes, and during that time, the victim tried to bargain with Defendant, even

offering him money if he would let her go. Defendant eventually stopped in a secluded area that looked like a construction site, pushed the victim down on a concrete slab, and forced her to have sexual intercourse.

Afterwards, Defendant threw the victim's pants to her, told her to put them back on, and then they began to walk again. When they approached a convenience store, the victim convinced Defendant to let her enter the store to get money to give him. While inside, the victim pretended to be getting money from the clerk and informed the clerk that she had been assaulted and to call the police. Defendant walked away before the police arrived.

The victim was taken to the hospital where a rape kit was obtained. Semen from the victim's vagina was submitted for DNA analysis. Several months later, the DNA from the rape kit was matched to a sample of DNA belonging to Defendant. A lineup of six men, including Defendant was then e-mailed to the victim who immediately identified Defendant as the perpetrator.

Defendant was charged by bill of information with forcible rape, a violation of La.R.S. 14:42.1, and aggravated kidnapping, a violation of La.R.S. 14:44. Defendant motioned the trial court to enter a plea of not guilty and not guilty by reason of insanity. Defendant also motioned the trial court for appointment of a Sanity Commission which was granted. Following the sanity hearing, the trial court ruled Defendant possessed the mental capacity to proceed to trial.

Prior to commencement of trial, the State filed an amended bill of information reducing the original charge of aggravated kidnapping to simple kidnapping. By a unanimous jury verdict, Defendant was found guilty as charged. Defendant moved for a post judgment verdict of acquittal which was denied. After waiving sentencing delays, Defendant was sentenced to forty years at hard labor for forcible rape, without

benefit of probation, parole or suspension of sentence, and to five years at hard labor for simple kidnapping, to run consecutively to his sentence for forcible rape. Defendant's oral motion to amend his sentences was denied. Defendant lodged this appeal, asserting three assignments of error involving his convictions and sentences.

**_____ASSIGNMENT OF ERROR NO. 1**

By this assignment of error, Defendant argues the evidence was not sufficient to prove forcible rape or simple kidnapping because the State failed to prove lack of consent. In the alternative, Defendant contends the State did not prove the victim was prevented from resisting the alleged rape.

The analysis for a claim of insufficient evidence is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

Forcible rape is defined in La.R.S. 14:42.1(A)(1) which provides:

> A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:

> (1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

Simple kidnapping is defined as "[t]he intentional and forcible seizing and carrying of any person from one place to another without his consent." La.R.S. 14:45(A)(1).

Defendant contends the State did not prove the victim did not consent to the alleged rape. Defendant asserts, first, that the victim did not attempt to attract the attention of patrons at the bar or surrounding clubs by yelling or screaming for help and she did not resist once she left the parking lot. Further, Defendant complains that, according to the victim, she was a virgin at the time of the alleged offenses, but was unable to say if she experienced bleeding after intercourse. Defendant is also critical of the victim's inability to show officers where the offense occurred on the day following the offenses.

Defendant points out while walking to the store after the alleged offenses, he gave her his sweatshirt to keep her warm. Defendant asserts that once the victim was in the store, she did not ask the clerk to lock the doors for protection; but instead, walked to the door, opened it, and returned Defendant's sweatshirt. Finally, Defendant maintains the convenience store's surveillance footage reveals the victim was in control and even smiled at the clerk.

Although the Defendant's assertion that the victim did not scream for help is supported by the record, the victim's testimony at trial, nonetheless, indicates she did not willingly leave the bar and resisted when Defendant began to take her from the parking lot. First, the victim testified Defendant physically restrained her in the parking lot and then pulled her away from the lot. She explained Defendant walked up behind her and grabbed her by the wrists. Defendant then began to make small talk, asking her where she was from. The victim testified she was very nervous at this time and told him she was not from the area and was looking for her friends. Defendant then told her to come along and he would show her a good time. The

victim declined Defendant's offer, but he continued to restrain her by the wrists and proceeded to pull her away from the parking lot.

Next, the victim testified about her struggle to get away. As Defendant was pulling the victim away, he continued to tell her that he was going to show her a good time. The victim kept repeating that she had to get back to her friends because they were going to be looking for her. When he continued to pull her away from the area, she squatted down, making herself dead weight. The victim explained she was wearing flip-flops, and he began to drag her across the ground. Defendant kept telling her to get up and come on or else he would beat her. The victim continued to stay low and Defendant was unable to move her. At that time, Defendant punched her in the face and continued to threaten to harm her if she did not comply.

The victim testified she was shocked after Defendant hit her, and to avoid being punched again, she tried to placate or cooperate with him. Defendant still had his hand on her wrists as she got up and was led away from the parking lot. At that time, the victim stated she stopped trying to escape, but began trying to verbally convince Defendant to let her go.

The victim bargained with Defendant, telling him she was "no good" and that he did not want her. She even offered him money. According to the victim, money was not what Defendant wanted. The victim also described moments when she would occasionally stop walking. Those attempts to resist, however, were thwarted by Defendant's threats to harm her again. All the while, Defendant was making sexual comments to her about how he wanted to sexually abuse her. The victim maintained there was never a time when she did not try to talk the Defendant out of acting on his threats.

The record also indicates the victim did not consent to sexual intercourse,

despite her inability to say whether or not she experienced bleeding after intercourse. After walking through a field, they stopped at what the victim described as an open construction site with a concrete slab and an overhang. At that point, the victim thought Defendant was going to sexually assault her and she started pleading for him not to rape her. Despite her pleas, Defendant pushed the victim down onto the concrete, straddled her, pulled off her pants, grabbed her shoulders and proceeded to sexually assault her.

The victim also testified that during the assault, Defendant became angry and was yelling at her, asking her why she did not like it and what was wrong with her. The victim continued to fear for her safety, believing he would hit her again. Afterwards, Defendant instructed the victim to put her pants back on, then took her by the arm and they began walking again. According to the victim, Defendant suddenly became very apologetic and started telling her that he was sorry. The victim stated she was shaking badly and felt cold, so Defendant gave her his sweatshirt to keep her warm.

The victim was eventually able to escape from Defendant. As they were walking along, they came upon a convenience store. Defendant asked for the money the victim had offered him earlier. According to the victim, she convinced Defendant to let her go into the store to get money with her ATM card. While in the store, the victim pretended to be obtaining money from the clerk. Instead, the victim informed the clerk she had been assaulted and instructed the clerk to call the police. While waiting for the police, Defendant was standing outside the door and motioned for her to return his sweatshirt. The victim removed the sweatshirt, walked to the door, threw it out the door to Defendant, who then walked away.

The Defendant suggests the victim's actions while in the store show she was

in control, and thus, demonstrated there was no lack of consent in leaving the bar and having sexual intercourse with him. Instead of asking the clerk to lock the doors, the victim returned his sweatshirt, and even smiled at the clerk while in the store. The victim's testimony, however, reflects just the opposite. The victim was afraid of further harm by Defendant, and up to that point, she had complied with his demands to avoid being hurt. Also, the police had not yet arrived to ensure her safety. There is no evidence that the victim entered the store for any other reason than to seek help. Lastly, we were unable to see any instance where the victim smiled at the clerk on the convenience store's surveillance footage submitted into evidence. The details of the victim's facial features are not obvious.

Lastly, the victim's testimony and that of the officers concerning the investigation that followed the alleged offenses further support the victim's contention that she did not consent to the offenses. The victim was taken to the hospital where she had a sexual assault exam performed. The victim stated that several people were trying to calm her down. At one point, the victim started crying and had to be left alone. The victim testified the wounds demonstrated in the photographs occurred during the assault and they were not present prior to her abduction.

The crime scene investigator, Sergeant Kristen Bayard, from the Lafayette Police Department, identified the photographs taken of the victim at the hospital that were offered into evidence. Sergeant Bayard observed that the victim had a contusion to her left cheek and eye area and had scratches on her cheek, left arm and back. The victim reported that she sustained the injuries when Defendant assaulted her.

The first officer to respond to the convenience store was Officer Jarvis Mayfield of the Lafayette Police Department. Officer Mayfield testified the victim

was trembling and was holding her left eye. The victim's left eye was semi-bloody and almost swollen shut. The victim reported she had been raped by an unknown black male after being pulled away from the Keg. The victim indicated she did not voluntarily leave with Defendant. She explained to Officer Mayfield that the unknown male approached her in the parking lot, made small talk and then immediately grabbed her by the wrists and pulled her away. During the abduction, Defendant punched her in the face and later, she was sexually assaulted.

Sergeant Reginald Thomas also investigated the alleged offenses. Sergeant Thomas testified when he first met the victim at the hospital, she had a large blackened eye that was badly swollen. According to Sergeant Thomas, the victim was very frightened and she was still shaking. The victim stated that Defendant approached her, attempted to make small talk, then began to pull her by her wrists. When she tried to pull away, he punched her. The victim gave Sergeant Thomas a description of her attacker. She also indicated she did not go with Defendant voluntarily, but went along with him out of fear. The victim explained that Defendant kept pulling her and threatening to harm her and was able to get her away from the area. After he punched her, the victim feared for her life and then walked along with Defendant.

With regard to the assault, the victim reported to Sergeant Thomas that Defendant pulled her to the cement, ripped off her pants and began to have sex with her. She stated she tried to resist at first, but Defendant punched her. The victim then feared for her life and thought if she went along with Defendant, she could survive. According to Sergeant Thomas, the victim stated she did not consent to going with or having sex with Defendant.

Considering the testimony and evidence presented at trial, we find the evidence

was sufficient to prove the victim did not willingly leave the parking lot with Defendant, nor did she consent to sexual intercourse. The victim was initially restrained by the wrists. After she was struck in the face by Defendant, she was prevented from resisting by continuous threats of additional harm, leading her to believe that any further resistance would not prevent the rape. As noted in *State v. Roca*, 03-1076, pp. 11-12 (La.App. 5 Cir. 1/13/04), 866 So.2d 867, 874, *writ denied*, 04-583 (La. 7/2/04), 877 So.2d 143:

> In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual finding. *State v. Stec*, 99-633, p. 4 (La.App. 5 Cir. 11/30/99), 749 So.2d 784, 787. In the case of sexual offenses, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even where the State does not introduce medical, scientific or physical evidence to prove the commission of the offense.

See also *State v. Rideaux*, 05-446, p. 2 (La.App. 3 Cir. 11/2/05), 916 So.2d 488. Accordingly, the victim's testimony was sufficient to prove lack of consent, and thus, Defendant's convictions are affirmed.

## ASSIGNMENT OF ERROR NO. 2

By this assignment or error, Defendant argues the trial court's finding that Defendant was competent to stand trial was erroneous. Defendant complains that not only were the examining physicians unable to evaluate him using the criteria set forth in *State v. Bennett*, 345 So.2d 1129 (La.1977), the trial court applied the incorrect burden of proof. The trial court's written ruling states, "In weighing the positive findings by Dr. McDonald that the defendant is able to stand trial, against the inconclusive evaluation of Dr. Escalona, the court fails to find ***clear and convincing evidence*** that the defendant lacks the mental capacity to proceed." (emphasis added).

In *State v. Carmouche*, 01-405, p. 30 (La. 5/14/02), 872 So.2d 1020, 1041, the supreme court stated:

-9-

Louisiana's statutory scheme for detecting mental incapacity jealously guards a defendant's right to a fair trial. In Louisiana, "[m]ental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense." La.C.Cr.P. art. 641. Our law also imposes a legal presumption that a defendant is sane and competent to proceed. La. R.S. 15:432. Accordingly, the defendant has the burden of proving by a preponderance of the evidence his incapacity to stand trial. A reviewing court owes the trial court's determinations as to the defendant's competency great weight, and the trial court's ruling thereon will not be disturbed on appeal absent a clear abuse of discretion . . . [citations omitted].

*See also State v. Anderson*, 06-2987 (La. 9/9/08), 996 So.2d 973, *cert. denied*, ___U.S. ___, 129 S.Ct. 1906 (2009).

Defendant also refers to *State v. Burmaster*, 97-517 (La.App. 3 Cir. 2/25/98), 710 So.2d 274, wherein the trial court did not allude to the burden of proof used in determining whether the defendant proved his incompetency. On appeal, the court was faced with determining whether the trial court erred in requiring proof of incompetency beyond the preponderance of the evidence standard. Two qualified physicians examined the defendant and found him to be competent to stand trial, and no contradictory evidence was adduced. Accordingly, the court concluded this defendant failed to prove he was incompetent by a preponderance of the evidence.

In this case, the State does concede the trial court applied the incorrect burden of proof, but maintains Defendant failed to prove his incapacity to stand trial under the lesser standard of preponderance of the evidence. In making its argument, the State refers to *State v. Silva*, 96-407 (La.App. 4 Cir. 9/3/97), 699 So.2d 487, *writ denied*, 97-2578 (La. 1/30/98), 709 So.2d 704, wherein the trial court did not identify the standard relied upon in finding the defendant competent to proceed. A review of the transcript, however, revealed that the defendant failed to prove his incapacity to proceed under the lesser standard.

In the instant case, Defendant maintains without a recorded contradictory

hearing, it is impossible to determine the outcome had the trial court applied the correct standard. The record reflects that a hearing was not held because both the State and Defendant agreed in a written supplemental order that the court should render a decision based upon the reports from the two physicians appointed for the Sanity Commission, Drs. Catherine McDonald and Daniel M. Escalona. As such, there is no hearing transcript to review. The trial court, however, issued a Written Ruling which included its reasons for ruling which we have reviewed.

Defendant maintains that neither physician adhered to the criteria set forth in *State v. Bennett*, 345 So.2d 1129, 1138 (La.1977), which are stated as follows:

> [W]hether [t]he [defendant] understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction.

Defendant asserts neither physician was able to examine him in light of these criteria due to his failure to cooperate. The State contends Defendant's refusal to cooperate does not indicate an erroneous decision by the trial court, but goes to his failure to meet his burden of proving his incapacity to proceed.

The report of Dr. McDonald dated December 7, 2006, concluded Defendant was able to stand trial. In reaching this conclusion, Dr. McDonald noted Defendant's history of extensive drug abuse and that Defendant has an antisocial personality. Dr. McDonald had difficulty evaluating Defendant's cognitive status because he refused to participate in cognitive testing. Defendant, however, talked freely about his social history and drug use. Dr. McDonald subsequently determined Defendant understood the charges, was aware of what a lawyer does and possessed a general idea of the court proceedings.

In Dr. Escalona's report dated August 14, 2007, he notes Defendant was

-11-

uncooperative and refused to speak with him. Dr. Escalona was unable to elicit any information from Defendant, but observed he was very guarded and paranoid. Accordingly, Dr. Escalona indicated his evaluation was not valid.

The jurisprudence reflects that a trial court may find a defendant competent to stand trial in situations where the defendant refuses to cooperate with physicians appointed to perform a competency evaluation. In *State v. Holmes*, 393 So.2d 670 (La.1981), the defendant refused to cooperate with the competency evaluations. Without opinions from the evaluating physicians, the trial court opted to question the defendant about his competency.

In affirming the trial court's ruling, the court stated:

> We find no error in this procedure. It is ultimately the responsibility of the judge to determine whether a defendant possesses the mental capacity to proceed to trial. C.Cr.P. 647. The report of the sanity commission is admissible as evidence, but it cannot be used as a substitute for the court's own judgment. Moreover, a trial judge's determination of a defendant's capacity to stand trial is entitled to great weight. Here, the trial judge did not refuse to accept the opinion of medical experts: no opinion as to the defendant's capacity to stand trial was offered, other than the suspicion that defendant was malingering. The issue is not whether the sanity commission usurped the judge's function, but whether the judge could reasonably make a determination of defendant's present sanity when the doctors could not.

Id. at 672-73 (Citations omitted). The court then proceeded to consider the evidence adduced at the sanity hearing and the decision of the trial court in light of the considerations set forth in *Bennett*.

Although both physicians in *Holmes* stated additional time was needed to determine whether the defendant's lack of cooperation was genuine or feigned, the court noted that the problem did not lie with the thoroughness of the evaluation, but involved the futility of examining the defendant. Also, the court observed that no allegations had been made as to the conscientiousness of the two physicians in attempting to complete the evaluations for which they had been appointed. The trial

court subsequently relied upon its observations of the defendant's outward demeanor and his occasional demonstration of his recollection of significant events and his extensive history of criminal activity to conclude that the defendant had an awareness of his legal rights and the consequences of a conviction. Although the defendant had a sixth grade education, there was no evidence he was mentally retarded or had ever been treated for mental illness.

Soon after the opinion in *Holmes*, the supreme court was presented with the same issue in *State v. Edwards*, 406 So.2d 1331 (La.1981), *cert. denied*, 456 U.S. 945, 102 S.Ct. 2011 (1982). Once more, the supreme court affirmed the trial judge's finding of competency despite the defendant's refusal to cooperate with his competency evaluations. The court noted that although the defendant's "general lack of cooperation and his unresponsive and flippant answers" caused the physicians to opine he should be observed for a longer period of time to determine his mental status, neither physician expressed the opinion he was incapable of proceeding to trial. *Id*. at 1342.

In finding the defendant was competent to stand trial, the *Edwards* court referred to its ruling in *Holmes* and reiterated that a defendant cannot prove his incapacity to stand trial by refusing to cooperate with the evaluations of the physicians. The court observed that the trial court's assessment of the defendant's capacity was aided by its observations of the defendant at various pretrial hearings.

The issue was indirectly addressed in a more recent case, *State v. Perkins*, 00-9 (La.App. 5 Cir. 5/17/00), 759 So.2d 334, *writ denied*, 00-1826 (La. 4/26/02), 813 So.2d 1098. In *Perkins*, the defendant refused to cooperate with his competency evaluation, but rather than ruling on his competency, the trial court failed to render a decision. On appeal, the defendant's conviction was subsequently reversed. In

addressing the necessity for a ruling on the defendant's capacity to proceed, despite his failure to cooperate, the court expounded:

> It is the defendant's burden to prove his incapacity to stand trial. *State v. Edwards*, 406 So.2d 1331 (La.1981). There is a presumption under Louisiana law that a defendant is sane, and he bears the burden of proving, by a preponderance of the evidence, that he is incapable of standing trial due to a mental disease or defect. *State v. Hernandez*, 98-448 (La.App. 5 Cir. 5/19/99), 735 So.2d 888.
>
> A court may receive expert medical testimony on the issue of a defendant's mental capacity to proceed; however, the ultimate decision of competency rests with the court alone. *State v. Hernandez, supra.* The defendant's cooperation, or lack thereof, is one factor for the trial judge to consider in his determination of competency. The defendant cannot prove his incapacity to stand trial merely by having stymied the efforts of the Sanity Commission. *State v. Edwards*, citing *State v. Holmes*, 393 So.2d 670 (La.1981). Likewise, the defendant's failure to cooperate with the Sanity Commission does not negate the necessity for a ruling on the defendant's mental capacity to proceed to trial.

*Id*. at 337.

A similar issue was addressed by the supreme court in *State v. Bright*, 97-2938 (La. 12/19/97), 706 So.2d 1386. In *Bright*, the State sought to determine the defendant's sanity at the time of the offense after the defendant entered a dual plea of not guilty and not guilty by reason of insanity. The defendant, however, refused to cooperate with the State's examining physician. In granting writs to the State, the court stated, "Because the defendant has placed his mental status at issue in the guilt phase of trial by entering a dual plea of not guilty and not guilty by reason of insanity, he may not refuse to cooperate in a mental examination conducted by an expert of the state's choosing and may not refuse to answer the questions posed by the state's expert to determine his sanity at the time of the offense. La.C.Cr.P. art. 646 (citations omitted)." *Id*. at 1386. The defendant was subsequently ordered to either submit to, and cooperate fully with, an examination by the State's expert or withdraw his dual plea of insanity and enter a single plea of not guilty.

In the instant case, Defendant entered a dual plea of not guilty and not guilty by reason of insanity and motioned the trial court to appoint a Sanity Commission. As such, Defendant placed his mental status at issue in the guilt phase of trial, but later refused to cooperate with the physicians appointed to the Sanity Commission. Defendant now claims neither physician received the cooperation necessary to render a finding on his mental capacity to proceed, and thus, the trial court's decision finding him competent to proceed to trial was erroneous.

We find Defendant's reasoning misguided. First, Defendant overlooks his burden of proof in showing that he did not have the capacity to stand trial. The fact that he refused to cooperate with the evaluations does not negate this burden. *Perkins*, 759 So.2d 334. Not only did Defendant fail to submit any evidence to show he was incompetent to stand trial, but Dr. McDonald concluded Defendant was able to stand trial, despite his lack of cooperation with the evaluation. Also, Dr. McDonald briefly addressed pertinent *Bennett* criteria in her evaluation and opined that Defendant understood the charges against him, that his lawyer was there to defend him, and that he had a general idea of the court proceedings. Further, Dr. Escalona did not render an opinion finding Defendant incompetent to stand trial. He only indicated Defendant's lack of cooperation prevented him from being able to perform a valid evaluation. Lastly, Defendant does not allege that Drs. McDonald and Escalona were not conscientious in attempting to complete their evaluations.

Without any evidence of the Defendant's incompetency to stand trial, in addition to Dr. McDonald's opinion that the Defendant was competent to proceed to trial, we cannot say the trial court's ruling was erroneous, even using the lesser standard of preponderance of the evidence. This assignment of error lacks merit.

**_____ASSIGNMENT OF ERROR NO. 3**

By this assignment of error, Defendant argues his sentences are excessive. Because an error patent exists with regard to the Defendant's sentence for simple kidnapping, we find that sentence must be vacated. As such, only the sentence for forcible rape is reviewed herein for excessiveness.

Following sentencing, Defendant orally moved to amend his sentence, asserting that it was severe in light of his non-violent past record. The motion was denied. Defendant did not file a written motion to reconsider his sentences.

On appeal, Defendant contends the trial court relied solely on his prior conviction for non-violent offenses, that it failed to consider his mental status as a mitigating factor, and that it failed to adequately consider the factors of La.Code Crim.P. art. 894.1. Defendant, however, did not set forth these allegations when he orally motioned the trial court to amend his sentence. Pursuant to La.Code Crim.P. art. 881.1, Defendant's failure to include these specific grounds in his motion precludes him from urging same for the first time on appeal. Thus, Defendant's allegations regarding the factors considered by the trial court in sentencing him are not properly before this court and will not be considered herein. *State v. Grogan*, 00-1800 (La.App. 3 Cir. 5/2/01), 786 So.2d 862.

This court has set forth the following standard to be used in reviewing excessive sentence claims:

> La.Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 [p.5] (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question

is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

*State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331.

To decide whether a sentence shocks the sense of justice or makes no meaningful contribution to acceptable penal goals, this court has held:

> [An] appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00), 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96), 674 So.2d 957, 958.

*State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061.

At sentencing, the trial court first confirmed that Defendant waived the seventy-two hour delay before imposing sentence. Regarding the first two *Smith* factors, the trial court noted it had reviewed Defendant's "rap sheet" and considered only the actual convictions. The trial court then stated, "after reviewing your criminal history, and noting that this is your fourth (4th) felony conviction, I'm going to give you the maximum, which is forty (40) years, without benefit of parole, probation of [sic] suspension of sentence." As noted above, Defendant moved to reduce his sentence in light of his non-violent past record, and the trial court responded:

> I think this is a stranger crime. This is a crime that was committed by a stranger on an individual, in our community, without any consent of the victim, which is one of the scariest crimes that our community faces. The brazenness of what you've done, by dragging this girl - -

Defendant interrupted the trial judge, stating, "I ain't did nothing." The trial court responded:

> Well, I understand, but you've been convicted. But, the brazenness of dragging this woman off and doing what you did is the reason I sentenced you so severely.

The sentencing range for forcible rape is five to forty years with at least two years to be imposed without benefit of probation, parole or suspension of sentence. La.R.S. 14:42.1. As such, Defendant received the maximum possible sentence. The courts agree that maximum sentences are typically reserved for the most serious offenses and the most egregious offenders. *See State v. Baker*, 08-54 (La.App. 3 Cir. 5/7/08), 986 So.2d 682.

Regarding the final *Smith* factor, the jurisprudence reflects the maximum forty-year sentence for forcible rape has been imposed and affirmed in several cases. In *State v. Hawkins*, 06-739 (La.App. 5 Cir. 9/25/07), 968 So.2d 1082, *writ denied*, 07-2272 (La. 4/18/08), 978 So.2d 347, the forty-one-year-old defendant was convicted of forcible rape and aggravated crime against nature involving his eighteen-year-old niece. He was sentenced to forty years and in sentencing that defendant, the trial court took into account the evidence presented at trial and the Pre-Sentence Investigation Report (PSI) that detailed an extensive criminal history. The trial court also considered the testimony of the victim, the severity of the crimes, and the threats and force used to commit the crimes. In affirming the sentences on appeal, the court compared the defendant's sentence for forcible rape to two other cases which also upheld the maximum sentence for forcible rape convictions:

> In *State v. Riche*, 608 So.2d 639 (La.App. 5 Cir. 10/27/92), *writ denied*, 613 So.2d 972 (La.1993), this Court upheld a forty year sentence for a defendant convicted of forcible rape. In *Riche*, the defendant raped the victim at knife point.

> In *State v. Williams*, 00-981 (La.App. 5 Cir. 4/11/01), 786 So.2d

> 805, 813-814, *writ denied*, 2001-1377 (La.3/28/02), 812 So.2d 646, this
> Court upheld a maximum sentence of 40 years [where] the defendant
> vaginally raped the victim twice and attempted anal intercourse. When
> the victim tried to escape, the defendant punched her in the face. The
> defendant also threatened to kill her with a knife. In addition, he caused
> her to be raped by a second man. *State v. Williams*, 786 So.2d at
> 813-814.

*Id*. at 1096.

In *State v. Jarrett*, 37,928 (La.App. 2 Cir. 12/10/03), 862 So.2d 440, the nineteen-year-old defendant pled guilty to the reduced charge of forcible rape and to aggravated burglary and was sentenced to consecutive maximum sentences of forty years and thirty years at hard labor. The defendant broke into the home of the fifty-two-year-old victim and threatened to harm her if she did not do whatever he said. He subsequently committed oral sexual battery on the victim, forced her to perform fellatio, and then proceeded to have vaginal intercourse with the victim. The defendant then left in the victim's car.

In sentencing the defendant, the trial court considered the defendant's Pre-Sentence Investigation Report. The trial court noted at the time of the offenses, the defendant was a deserter from the U.S. Navy. The defendant had three misdemeanor convictions, but the offenses before the court were his first felony convictions. Although he dropped out of school in tenth grade, he had obtained his GED. The defendant began abusing drugs at an early age, including LSD, ecstasy, marijuana and prescription medications. His medical history included a diagnosis of impulse control disorder, but he chose to stop taking prescribed medication.

In *State v. Gray*, 36,389 (La.App. 2 Cir. 9/18/02), 828 So.2d 176, consecutive forty-year sentences were affirmed for forcible rape. The thirty-one-year-old defendant pled guilty to two counts of forcible rape reduced from aggravated rape, in exchange for the State's agreement not to charge him as a habitual offender and to

dismiss charges of attempted aggravated rape, simple robbery and simple kidnapping. The victims were assaulted in the same washateria, two weeks apart. After threatening to break the neck of his victims, he proceeded to have non-consensual vaginal intercourse with the victims. After the assault, the defendant took $8 from the first victim and cash and a cellular phone from the second victim.

At sentencing, the trial court considered the PSI which revealed that the defendant failed to complete high school, had a sporadic work history and had a lengthy criminal record, including forty-five arrests as an adult. Most of the offenses were crimes against the person. The trial court also reviewed the facts of the case, noting the defendant's claims that the victims had come on to him, the evidence which indicated that he was guilty of aggravated rapes, his plea bargain which drastically reduced his sentencing exposure, his calculated and deliberate cruelty to the victims, the risk of great bodily harm to both victims, the significant and permanent psychological injury to both victims, that the offenses were committed without any provocation, excuse or justification and that the defendant would likely continue with heinous criminal conduct.

In the instant case, the trial court did not elaborate on the factors considered at sentencing other than Defendant's criminal history and the seriousness of the crime. Defendant was sentenced directly following his conviction, and thus, the trial court was privy to the testimony and evidence presented just prior to sentencing. Also, due to the waiver of the sentencing delay, a PSI was not ordered.

The testimony of the victim, a young college student at the time of the offense, indicated that she traveled from Connecticut to testify at Defendant's trial. She described both the physical force and threats of violence used by the Defendant to commit of the offense. Additionally, the victim testified that she was a virgin prior

to the offense and was visiting Lafayette, Louisiana for her first time in anticipation of a scholastic event. The physical evidence and Defendant's DNA confirmed he did, in fact, have sexual intercourse with the victim. Also, the photographs of the victim admitted into evidence demonstrated the injury to her face and eye as well as scratches and scrapes about her body. Taking the details of the assault into account and the extensive criminal history of the Defendant, we find the trial court did not abuse its discretion in imposing the maximum sentence for forcible rape.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, there are two errors patent.

First, we note Defendant's sentence for simple kidnapping was indeterminate. Simple kidnapping is punishable by imprisonment with or without hard labor. The commitment and court minutes of sentencing reflect the trial court imposed this sentence at hard labor; however, the transcript reveals the trial court did not so specify. In imposing Defendant's sentence, the court stated, "[a]nd for the crime of simple kidnapping, I'm going to give you five (5) years. And I'm going to run that consecutive with the forty (40) years." Thus, the court imposed an indeterminate sentence. Accordingly, Defendant's sentence for simple kidnapping should be vacated, and the case remanded for the imposition of a determinate sentence, with the trial court being instructed to specify whether the sentence is to be served with or without hard labor. *State v. Matthew*, 07-1326 (La.App. 3 Cir. 5/28/08), 983 So.2d 994, *State v. Roberson*, 06-1568 (La.App. 3 Cir. 5/2/07), 956 So.2d 736, *writ denied*, 07-1243 (La. 12/14/07), 970 So.2d 531, and *State v. Loyden*, 04-1558 (La.App. 3 Cir. 4/6/05), 899 So.2d 166.

Finally, the record does not indicate the trial court advised Defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Thus, the trial court is directed to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 at resentencing.

## DECREE

For the foregoing reasons, Defendant's convictions are affirmed. His sentence for forcible rape is affirmed. For the reasons previously set forth, Defendant's sentence for simple kidnapping is vacated, and the case remanded for the imposition of a determinate sentence, with the trial court instructed to specify whether the sentence is to be served with or without hard labor. The trial court is also directed to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 at resentencing.

**CONVICTIONS AFFIRMED; SENTENCE FOR FORCIBLE RAPE AFFIRMED; SENTENCE FOR SIMPLE KIDNAPPING VACATED; REMANDED FOR RESENTENCING.**

**THIS OPINION IS NOT DESIGNATED FOR PUBLICATION. Rule 2-16.3, Uniform Rules, Courts of Appeal.**